Appeal No. 2016-1282

# United States Court of Appeals

*for the*

# Federal Circuit

ENPLAS CORPORATION,

*Appellant,*

– v. –

SEOUL SEMICONDUCTOR CO., LTD., NORTH AMERICA
SEOUL SEMICONDUCTOR, INC.,

*Appellees.*

APPEAL FROM THE UNITED STATES PATENT AND
TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD
IN CASE NO. IPR2014-00605

## BRIEF FOR APPELLEES

MICHAEL B. EISENBERG
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3200

*Attorneys for Appellees*

March 16, 2016

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Fed. Cir. R. 47.4, Michael B. Eisenberg, counsel for Appellees

Seoul Semiconductor Co., Ltd. and North America Seoul Semiconductor Inc.,

certifies the following:

1.     The full name of every party represented by me is: Seoul Semiconductor

Co., Ltd. and North America Seoul Semiconductor Inc.

2.     The names of the real party in interest (if the party named in the caption is

not the real party in interest) represented by me is: None.

3.     All parent corporations and any publicly held companies that own 10 percent

or more of the stock of the parties represented by me are: None.

4.     The names of all law firms and partners or associates that appeared for the

parties now represented by me in the trial court or are expected to appear in this

court are Michael B. Eisenberg and David Wallace from Holland & Knight LLP,

Bob Steinberg from Latham & Watkins, and Elizabeth Roesel formerly of Latham

& Watkins.


March 16, 2016                          /s/ Michael Eisenberg
                                        Signature of Counsel


i

# TABLE OF CONTENTS

Page

COUNTER-STATEMENT OF THE ISSUES ...................................................1

PRELIMINARY STATEMENT .....................................................................1

STATEMENT OF THE CASE .......................................................................3

    **A.**    **U.S. Patent No. 5,577,493 ("Parkyn")** ................................3

    **B.**    **The '723 Patent** ........................................................................5

    **C.**    **Procedural History** ................................................................11

SUMMARY OF ARGUMENT .....................................................................17

ARGUMENT .............................................................................................19

**I.**    **Standard of Review**................................................................19

**II.**    **The Board's Anticipation Finding Is Supported by Substantial Evidence** ..................................................................20

    **A.**    **Substantial Evidence Supports the Board's Finding that Parkyn Discloses Conditions 1 and 2**................................20

    **B.**    **Enplas Intentionally Left the Evidence Supporting Anticipation Unrebutted**...................................................26

**III.**    **Enplas's Attempt to Manufacture a Claim Construction Dispute Fails** ...........................................................................28

**IV.**    **Enplas's Remaining Arguments Fail to Establish a Lack of Substantial Evidence** ..........................................................31

    **A.**    **The Board's Finding that Parkyn Disclosed Conditions 1 and 2 Over the Half-Intensity-Angular-Range Is Supported By Substantial Evidence** ..........................................................31

    **B.**    **Enplas's Arguments Regarding the Reliability of Parkyn's Figures and Dr. Sasian's Drawings Are Misdirected** ...................33

    **C.**    **Enplas's "*ipssimis verbis*" Test for Anticipation is Baseless**..........36

    **D.**    **Enplas's Attempts to Narrow Parkyn's Disclosure and Add Further Limitations to the '723 Patent Lack Merit**.......................37

       **1.**     **The Board correctly rejected Enplas's argument that Parkyn requires a Total Internal Reflection (TIR) lens together with a mushroom lens**.............................................37

       **2.**     **Because the claims do not require "uniform" light, Enplas's arguments about Parkyn's non-uniformity are irrelevant**..............................................................39

   **E.**    **Enplas's Attacks on the Form and Alleged Motivation Behind the Board's Decision are Baseless**....................................................40

**V.**   **Should the Court Determine that the Board's Decision was not Supported by Substantial Evidence, Seoul Semiconductor Requests Remand for Consideration of Issues Passed On by the Board** ...............42

**CONCLUSION** ........................................................................................................43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Abbs v. Principi,*
   237 F.3d 1342 (Fed. Cir. 2001) ..........................................................31

*Aqua Shield v. Inter Pool Cover Team,*
   774 F.3d 766 (Fed. Cir. 2014) ...........................................................41

*Broadcom Corp. v. Emulex Corp.,*
   732 F.3d 1325 (Fed. Cir. 2013) ........................................................27

*Broadcom Corp. v. Qualcomm Inc.,*
   543 F.3d 683 (Fed. Cir. 2008) ...........................................................28

*Brown v. Dep't of the Navy,*
   229 F.3d 1356 (Fed. Cir. 2000) ........................................................27

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
   246 F.3d 1336 (Fed. Cir. 2001) ........................................................38

*In re Chapman,*
   595 F.3d 1330 (Fed. Cir. 2010) ........................................................43

*In re Gartside,*
   203 F.3d 1305 (Fed. Cir. 2000) .........................................19, 30, 33

*In re Jung,*
   637 F.3d 1356 (Fed. Cir. 2011) ........................................................41

*In re Mraz,*
   455 F.2d 1069 (CCPA 1972) .............................................................36

*In re Pappas,*
   214 F.2d 172 (C.C.P.A. 1954) ...........................................................37

*In re Schreiber,*
   128 F.3d 1473 (Fed. Cir. 1997) .................................................19, 36

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino,*
   738 F.3d 1337 (Fed. Cir. 2013) ........................................................43

iv

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   558 F.3d 1341 (Fed. Cir. 2009) .........................................................27

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
   284 F.3d 1261 (Fed. Cir. 2002) .........................................................33

*O'Brien v. Office of Personnel Management*,
   144 F.3d 1458 (Fed. Cir. 1998) ...................................................26, 27

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) . Application of the ..........................30

*Prolitec, Inc. v. ScentAir Technologies, Inc.*,
   807 F.3d 1353 (Fed. Cir. 2015) ...................................................29, 30

*Redline Detection, LLC v. Star Envirotech, Inc.*,
   811 F.3d 435 (Fed. Cir. 2015) ...........................................................31

*SightSound Technologies, LLC v. Apple, Inc.*,
   __ F.3d __, 2015 WL 8770164 (Fed. Cir. 2015)................................30

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) .........................................................29

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (U.S. 2015)...........................................................19, 20

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
   782 F.3d 671 (Fed. Cir. 2015) ...........................................................28

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
   793 F.3d 1306 (Fed. Cir. 2015) .........................................................21

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) .............................................................40

*Yorkey v. Diab*,
   601 F.3d 1279 (Fed. Cir. 2010) .........................................................21

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Appellees, Seoul Semiconductor Co., Ltd. and North America Seoul Semiconductor Inc., states as follows:

(a) No other appeal from the Decision of the United States Patent and Trademark Office Patent Trial and Appeal Board appealed from herein was previously before this or any other appellate court.

(b) Counsel is unaware of any case that is pending in this or any other court that will directly affect or will be directly affected by the decision of the Court of Appeals for the Federal Circuit in this matter.

## COUNTER-STATEMENT OF THE ISSUES

I.      Whether there is substantial evidence in the record to support the

Patent Trial and Appeal Board's ("Board") factual finding that claims 1 and 17 of

U.S. Patent No. 7,348,723 ("the '723 patent") are anticipated by U.S. Patent No.

5,577,493, issued to Parkyn, Jr. *et al.* ("Parkyn").[1]

II.      Whether Appellant Enplas Corporation ("Enplas") waived its claim

construction argument by failing to raise it before the Board.

## PRELIMINARY STATEMENT

The only issue raised by Enplas on appeal that is preserved for this Court's

review is Enplas's challenge to the Board's finding that claims 1 and 17 of the '723

patent are anticipated by Parkyn. Because anticipation is a question of fact, this

Court reviews that finding with great deference, asking only if there is "substantial

evidence" in the record to support the Board's conclusion. Here, there is ample

evidence to support the Board's finding. The Board properly relied on the written

description and figures of Parkyn itself, as well as the expert testimony of Dr. Jose

Sasian, whose testimony the Board expressly credited over the testimony of

Enplas's expert. Dr. Sasian explained in detail, and the Board accepted, that the

---

[1] Enplas makes no separate argument on appeal that claims 2-9 and 11-16 of the '723 Patent are not anticipated by Parkyn or rendered obvious over Parkyn in view of U.S. Patent App. No. US 2004/0070989, issued to Amano *et al.* ("Amano"), if, as the Board held, claims 1 and 17 are anticipated by Parkyn.

mathematical formulas in claims 1 and 17, on which Enplas's entire argument rests, are merely alternative ways of expressing the same relationships that Parkyn disclosed in words and figures many years before the '723 patent's priority date.

While Enplas attacks certain aspects of Dr. Sasian's testimony, those arguments miss the mark. For example, Enplas mischaracterizes the role played by certain calculations Dr. Sasian made based on Parkyn's figures, which the Board did not rely on for its decision. In the end, Enplas disagrees with the Board's credibility determinations and how it weighed the evidence, but it is not the role of this Court to reweigh those aspects of the Board's fact-finding.

Presumably because it recognizes the difficulty of overturning the Board's factual finding of anticipation, Enplas attempts to recast its challenge to the Board's fact-finding as a legal dispute concerning claim construction, but that effort fails. Before the Board, Enplas never contended that any of the claim terms required construction, and the Board, in reliance on that position, adopted no claim constructions. What Enplas tries to characterize as claim construction is no more than the Board's restatement, in words, of the relationship reflected by the mathematical formulas in claims 1 and 17. Having failed to argue before the Board that the claim terms required construction, Enplas is barred from arguing that position on appeal.

## STATEMENT OF THE CASE

### A.    U.S. Patent No. 5,577,493 ("Parkyn")

What Enplas claims to have invented was, in fact, already disclosed many

years earlier in U.S. Patent No. 5,577,493 to Parkyn, Jr. *et al.* ("Parkyn"). Parkyn,

which is entitled "Auxiliary Lens to Modify the Output Flux Distribution of a TIR

Lens," was issued on November 26, 1996. (A481.)

Parkyn addresses the problem

in the prior art of an unequal

intensity of light rays emitting from

a light source, which was

undesirable for backlighting liquid

crystal displays. Figure 1 of Parkyn



(reproduced to the right) shows a total internal reflection (TIR) lens 1 collimating

(making a column of parallel rays of) light from a light source 3. (A482, A499 at

2:44-45.) Parkyn explains that the parallel "rays 5

coming out of the center of the lens are closer together

than rays 6 at the outer edge region, indicating higher

flux levels [*i.e.*, brightness] near the center than at the

edges." (*Id.* at 2:47-49.) This higher flux, *i.e.*, brighter,

central region is also shown in figure 2a of Parkyn



(reproduced to the right), which is a "three-dimensional plot of . . . flux density" and depicts "a prominent central hot spot 10, with steady fall off of light flux per unit area toward the dimly illuminated edges." (A499 at 2:61-65, A484.) The resulting higher flux (brighter) center and steady fall off to the sides results in non-uniformity, which Parkyn describes as "less desirable" for uses including "[b]acklighting of liquid crystal displays." (A499 at 1:27-30.) This is the same problem addressed many years later by the '723 patent. (A739 ¶ 38.)

To address this shortcoming, Parkyn discloses adding a lens to the input side of the TIR lens "to magnify the image of the source for sideways directions (i.e., towards the rim of the TIR lens), while demagnifying it for upwards directions (i.e., along the axis of symmetry of the TIR lens)."  (A499 at 1:30-33.) Parkyn discloses two embodiments of the inventive lens, a thin light deviator and a thick lens deviator. (A500 at 4:19-20.) Parkyn refers to the thick lens deviator variously as a "mushroom lens," "light ray deviator," or "deviator lens." (A499 at 1:48-55, A501 at 5:19-21.) Figure 15a of Parkyn (reproduced to the right) shows an "LED . . . embedded in



mushroom lens 113, shaped to cause TIR lens 114 to have uniform output." (A498, A501 at 6:60-62.)

4

The light-smoothing function of Parkyn's mushroom lens can be seen by comparing the output of the TIR lens alone as depicted in figures 1 and 2a (above) with the modified output as shown in figure 14a (reproduced to the right) created by adding a mushroom lens at the input side of a TIR lens. (A501 at 6:49-51.) Parkyn explains that the previous high flux  (brighter) central region has been demagnified by the central concave dip of the "light ray deviator." (*Id*. at 5:46-51, 6:51-53.) At the same time, the outer regions, which had experienced a steady fall off in flux in the prior art are now shown with increased flux resulting in "a prominent central flat zone." (*Id.*) Parkyn describes this effect as "spreading the light out from the peak until a flat distribution is achieved." (A500 at 3:3-4.)

## B.    The '723 Patent

Many years after Parkyn issued, Enplas filed the '723 patent, seeking to patent the same invention. The '723 patent was filed on September 27, 2005, claiming foreign priority to a Japanese patent application filed exactly one year earlier. (A19.) The title of the '723 patent is "Emission Device, Surface Light Source Device, Display and Light Flux Control Member." (*Id.*) Independent

5

Claims 1 and 17 of the '723 patent each recite a light flux control member, or "lens."[2]

The '723 patent explains that it is addressed to the same purported problem addressed by Parkyn. As explained with respect to figure 15 (reproduced in relevant part to the right), the '723 patent stated that it was known in the prior art to use a "hemisphere-like" lens 123 with an LED 124. (A33 at 1:57-65.) Such LEDs, by their nature, possess non-uniform output.[3] (A730 ¶ 18, A722.) The greatest intensity occurs along the optical axis L, with gradually decreasing intensity away from the optical axis. (*Id*.) This non-uniform distribution is often described as a cosine-dependent or Lambertian distribution. (*Id*.) In words that could easily have been used to describe Parkyn's figure 2a, the '723 patent characterizes this non-uniform distribution as follows:

> In general, light emitting element 4 has the maximum emission intensity direction along optical axis L . . . . Emission intensity of light emitting element 4 falls gradually according to an increasing angular

---

[2] The parties have referred to the "light flux control member" interchangeably as a "lens." *See, e.g.*, Appellant Br. at 4. For ease of reference, the term lens will be used in this brief unless quoting from the '723 patent or its claims.

[3] The '723 patent does not propose any change to the LED itself. (A730 ¶ 18.) Instead, LED non-uniformity comprises a characteristic that the '723 patent purports to address. *Id.*

6

deviation from the maximum emission intensity direction [along optical axis L].

(A35 at 6:46-56.)

The non-uniformity of light emission from an LED can be characterized in terms of a "half-intensity-angular-range" or "half angle." (A730-31 ¶ 19.) The half-intensity-angular-range is explained in the specification of the '723 patent as the "angular range extending up to an intensity falling of 50% as compared with the maximum emission intensity from the maximum emission intensity direction." (A35 at 6:53-56.) In other words, the half-intensity-angular-range includes intensities that are at least half the intensity at the optical axis. (A730-31 ¶ 19.) For an LED, the half-intensity-angular range represents the central portion of the light output, which comprises the majority of the useful light output. (*Id.*)

The '723 patent explains that, due to the non-uniformity of LED light output, passing the light through a hemisphere-like lens 123 results in a locally bright area along the optical axis of the lens. (A33 at 2:32-34, A37 at 10:40-58, A29, A729 ¶ 17.) This locally bright area is represented by the central peak in the emission intensity curve B of figure 10 of the '723 patent (reproduced in relevant part to the right). (A33 at 2:32-34, A37 at 10:40-58, A29, A729 ¶ 17.) According to the '723 patent, this  intensity peak results in unwanted "brightness unevenness." (A33 2:28-30.)

To address this purported prior art shortcoming, the '723 patent discloses modifying the cross-sectional shape of the lens to include a central "concave" dip "shaped like a partially removed sphere." (A35 at 6:4-7.) An example of the resulting lens cross section is shown as lens 5 of figure 2 (reproduced in relevant part to the right). (A21, A35 at 6:4-7, A732.) According to the '723 patent, instead of the locally bright area along the central optical axis as represented by the peak of curve B of figure 10 (reproduced above), the LED



output is spread out as depicted by the modified emission intensity Curve A. (A29, A37 at 10:53-58 ("Curve A shows a gently rising mountain-like changing while Curve B shows a sharp rising in the vicinity of optical axis L."), A38 at 11:16-19, A732-33).)

8

To explain how the spreading is accomplished by lens 5, the '723 patent describes an exemplary light beam H and the angles θ1 and θ5 as depicted in figure 3 (reproduced in relevant part below to the right). (A36 at 7:27-32,



A733-34.) While inside the lens 5, light beam H travels along angle θ1. (A36 at 7:27-32, A733-34.) Upon transitioning from the lens 5 into the "ambient medium (air)," the beam H is bent according to Snell's law to travel along a larger angle θ5. (A36 at 7:27-32.) It is this outward bending of light from smaller angles θ1 to larger angles θ5 that results in the change from Curve B to Curve A in figure 10. (A29, A38 at 11:16-19.) The record includes a number of synonyms for this optical property including: spreading (A38 at 11:18, A500 at 3:3, A732 ¶ 21, A741 ¶ 44); diverging (A36 at 7:10, A733 ¶ 23, A747 ¶ 53, A895 at 14-19); and deviating (A499 at 1:49-50, A735 ¶ 26, A747 ¶ 53, A1121 ¶ 55, A1128 ¶ 68).

The specification of the '723 patent describes the outward bending of light using the term "Condition 1" which is explained as "Relation θ5/θ1>1."[4] (A35 at

---

[4] The specification excludes from Condition 1 the "light emitted toward within an angular-neighborhood of a standard optical axis L of [the] emission device." (A38 at 12:15-17.) In other words, within that area, Condition 1 need not hold.

6:63-65.) This expression means that the outer surface of the lens causes light from the light source to be bent (deviated) away from the central axis of the lens. (A9, A747 ¶ 53.)

As shown in figure 10, light at angles closest to the optical axis is most strongly bent away (deviated) from that optical axis. (A29.) And light at increasing angles from the optical axis is progressively less strongly bent (deviated) away from the optical axis. (*Id.*) The specification of the '723 patent describes this optical property using the term "Condition 2" which is explained as "[the] Value of θ5/θ1 falls gradually according to increasing θ1." (A35 at 6:66-67, A747 ¶ 53.) This expression means that the relative amount of bending is greatest near the central axis of the lens and decreases at angles further from the optical axis. (A9, A747 ¶ 53.)

The '723 patent does not require that Conditions 1 and 2 as disclosed in the specification be true for the entire top surface of the disclosed lens. (A35 at 6:57-61.) Rather, they are required only within the half-intensity-angular-range. (*Id.*) In other words, Conditions 1 and 2 describe only the deviation of light within the bright central portion of the light source's output.

The focus of the parties' dispute is claim 1 of the '723 patent, which recites:

An emission device comprising a light flux control member provided with a recess and an light control emission face, and a light emitting element accommodated in said recess, said light emitting element

10

emits light which is emitted from said light control emission face after travelling within said light flux control member,

> wherein said light control emission face is configured so as to satisfy the following Conditions 1 and 2 for at least light which is emitted toward within a half-intensity-angular-range around a maximum-intensity-emission-direction from said light emitting element;
>
> Condition 1: Relation $\theta5/\theta1>1$ is satisfied except for light emitted toward within an angular-neighborhood of a standard optical axis of said emission device;
>
> Condition 2: Value of $\theta5/\theta1$ decreases gradually according to increasing of $\theta1$;

where $\theta1$ is an emission angle of any light at being emitted from said light emitting element, and $\theta5$ is an emission angle of that light of $\theta1$ at then being emitted from said light control emission face of said light flux control member.

(A38 at 12:4-23.)

## C.    Procedural History

Seoul Semiconductor Co. Ltd. and North America Seoul Semiconductor, Inc. (collectively "Seoul Semiconductor") filed a request for *Inter Partes* Review of U.S. Patent No. 7,348,723 ("the Petition") on April 10, 2014. (A101.) The Petition included four grounds for invalidity: (1) claims 1-9 and 11-17 are invalid as anticipated by Parkyn; (2) claims 1-8 and 17 are invalid as inherently anticipated by Parkyn; (3) claims 1-9 and 11-17 are invalid as obvious based on Parkyn; and (4) claims 9-16 are invalid as obvious based on Parkyn in view of U.S. Patent App. No. US 2004/0070989 to Amano *et al.* ("Amano"). (A44; *see also* A5.) Seoul Semiconductor also supported the Petition with a declaration from Dr. Jose Sasian

11

("Sasian Declaration"). (A724.) Both the Sasian Declaration and the Petition relied on the characteristics of Parkyn's mushroom lens as disclosed in the written description and figures of Parkyn. (*See*, *e.g.*, A65-69, A747-53 ¶¶ 54-66.) The Sasian Declaration also provided "hand drawings" and "computer simulations" to confirm those characteristics. (A764-66 ¶¶ 87-92, A164.)

In its Preliminary Response, Enplas focused its analysis on Conditions 1 and 2 of claim 1. (A127.) Enplas did not contend that either term required construction by the Board, but instead relied on the "plain language of the claims." (A132.) Based on the language of Conditions 1 and 2, Enplas argued that the Petition and the supporting declaration from Dr. Sasian provided insufficient evidence to support institution. (A140-41.) Enplas also questioned the relevance of the hand drawings and simulations provided in the Sasian Declaration. (A141-43.)

In its September 22, 2014 Institution Decision, the Board found that Seoul Semiconductor had carried its burden of providing evidence that raised a reasonable likelihood of prevailing. (A164.) As an initial matter, the Board agreed with Enplas that there was no need to construe Conditions 1 and 2. (A161.) Based on the plain language of the claims, the Board held that Seoul Semiconductor's evidence, if not rebutted, established anticipation of both Conditions. (A163-64.)

The Board noted that Enplas had failed to address the full scope of Seoul Semiconductor's evidence, including the evidence provided in the Sasian

12

Declaration. The Board observed that Enplas did not "address Dr. Sasian's analysis based on the breadth of the claim terms, specific text in Parkyn, and the general shape of the structures in Parkyn's drawings that are consistent with the reference's verbal description of the structures." (A163-64 (citing Sasian Decl. ¶¶ 53–66 (A747-53); Parkyn at 5:46–51 (A501), Fig. 15a (mushroom lens 113) (A498).) Nor, the Board emphasized, did Enplas "address Dr. Sasian's additional, supporting analysis of Figures 2a and 14a of Parkyn, which set forth three-dimensional plots of flux density." (A164 (citing Sasian Decl. ¶¶ 63–64 (A751-52); Parkyn at 2:1–5, 36-38 (A499)).)

In its Institution Decision, the Board specifically found "Dr. Sasian's testimony at paragraphs 53 through 66 to be persuasive." (A164.) Finally, as to Dr. Sasian's hand drawings and computer simulations, the Board granted institution without relying on that evidence. Stressing that "the testimony in paragraphs 53 through 66 of the Sasian Declaration [was] sufficient to show, to a reasonable likelihood, that Parkyn anticipates claim 1," the Board made clear that "[f]or purposes of this decision, we need not address [Enplas's] arguments with respect to the [Sasian] testimony based on hand drawings and computer simulations," which was the subject of Sasian's paragraphs 82 through 106. (*Id.*) Based on its preliminary findings, the Board instituted review of "anticipation and obviousness

13

over Parkyn as to claims 1–9 and 11–17 and on the ground of obviousness over Parkyn and Amano as to claims 9–16." (A166.)

Following the Institution Decision, Enplas submitted a Response that again failed to argue that the terms of Conditions 1 and 2 required construction. (*See*, *e.g.*, A236.) Instead, Enplas focused its Response on purported problems with the simulations Dr. Sasian had performed (on which the Board had not relied) and on the assertion that Parkyn's disclosure was limited to using a mushroom lens in combination with a TIR lens. (*See*, *e.g.*, A237, A241, A243.) Along with its Response, Enplas submitted a declaration from Dr. Timothy Drabik. (A1096.) During Dr. Drabik's deposition, he admitted that his declaration did not respond to the evidence upon which the Board's Institution Decision expressly relied. (A949-52 (141:5-144:5), A963-64 (155:10-156:21).)

Following the submission of Seoul Semiconductor's Reply (A313) and an Oral Hearing (A424) held on June 10, 2015, the Board issued a Final Written Decision ("Final Decision") (A1), on September 11, 2015. The Board confirmed that there was no need to construe the claim terms as a legal matter, because the parties had agreed that "the claimed 'conditions' do not require express construction beyond applying the plain and ordinary meaning of the terms." (A6.) Based on the plain meaning of the claims, the Board reviewed the evidence in the record including: the text of Parkyn (A10), the shapes of Parkyn's lenses as

14

disclosed in the figures (*id.*), Dr. Sasian's analysis (A10-11), and Dr. Drabik's analysis (A10). In performing the review, the Board expressly "credit[ed] Dr. Sasian's testimony over that of Dr. Drabik" for reasons including that Dr. Drabik erroneously "fault[ed] Parkyn for not setting out the Conditions in the same terms as used in the claims." (A10-11).

The Board observed that, as Dr. Sasian explained, the two Conditions in claims 1 and 17 were "simply, broadly recited relationships (expressed as ratios) between two light emission angles." (A11.) The Conditions, as expressed in the '723 patent, "use many words to describe two simple and straightforward lens conscepts." (A9 (quoting Sasian Decl. ¶ 53(A747)).) In particular, Condition 1, which requires that $\theta5/\theta1>1$, "merely means that the outer surface of the lens causes light rays emitted from the light source to be deviated away from the central axis of the lens," thereby making $\theta5$ larger than $\theta1$. (*Id.*) And Condition 2, which requires that the ratio of $\theta5/\theta1$ decreases as $\theta1$ increases, merely explains that "the amount of deviation . . . will be greatest near the central axis of the lens and will decrease at increasing angles from the optical axis." (*Id.*)

The Board credited Dr. Sasian's analysis of the "specific text in Parkyn," including Parkyn's "textual description" of the varying curvature of "mushroom lens 39" (A10), which made clear "[t]he fact that the outer surface of Parkyn's lens is designed to and in fact does cause light rays to be deviated away from the central

15

axis of the lens," (A747 ¶ 54 (Sasian Decl.); A10 (Final Decision quoting same),
*see also* A749 ¶¶ 59-61 (observing that this conclusion was further supported by
the fact that Parkyn called his light flux control member a "light ray deviator" and
that its fundamental purpose was "to spread out a central dense light intensity
profile to provide a more even distribution").) The Board likewise credited Dr.
Sasian's reference "to the text of Parkyn" and "to the shape of Parkyn's light flux
control member" to "explain[] how the claimed 'Condition 2' relationship between
$\theta 5$ and $\theta 1$ is met by [Parkyn]." (A10 (citing Sasian Decl. ¶¶ 54, 61).) In those cited
paragraphs, Dr. Sasian explains that, based on Parkyn's textual description of the
"varying curvatures of the convex outer surface" and accompanying figures, it
"can be seen" that "[a]s the ray emission angle $\theta 1$ increases, . . . the shape of
Parkyn's light flux control member transitions smoothly to a convex shape, such
that with increasing angle $\theta 1$, the ray deviation lessens, *i.e.*, the ratio between $\theta 5$
and $\theta 1$ falls." (A747, A750 ¶¶ 54, 61.)

The Board again rejected Enplas's attempt to attack Dr. Sasian's hand
drawings and computer simulations, rather than address "the particular text and
drawings in Parkyn upon which Dr. Sasian relies in explaining why Parkyn
describes the general relationships set out in the Conditions." (A12.) As it did in
the Institution Decision, the Board specified that the Final Decision was not based

16

on Dr. Sasian's testimony concerning his hand drawings and computer simulations. (*Id.*)

Based on its review of the evidence, the Board concluded that "Petitioner has established, by a preponderance of the evidence, that claims 1-9 and 11-17 are anticipated by Parkyn." (A13.) Having held those claims invalid as anticipated, the Board did not reach the issue of single-reference obviousness based on Parkyn. (*Id.*) Finally, the Board found claims 9-16 invalid based on obviousness over Parkyn and Amano. (A14.)

## SUMMARY OF ARGUMENT

The Board's factual finding that the claims of the '723 patent are anticipated by Parkyn is amply supported by the record evidence, as reflected in the Board's detailed analysis. Parkyn and the '723 patent are addressed to the same problem, and solve that problem in the same way, but Parkyn did so at least eight years before the '723 patent. The Board relied on the written description and figures of Parkyn, and on the expert testimony of Dr. Sasian, whose testimony the Board expressly credited over that of Enplas's expert. Dr. Sasian explained how the text and figures of Parkyn already disclosed the relationships that were later claimed by the '723 patent using mathematical ratios. Parkyn's disclosure of a "mushroom lens" with "varying curvatures of convex outer surface . . . decreasing at regions toward [the] axis" to act as a "light ray deviator" in order to "spread[] the light out

17

from the peak until a flat distribution is achieved," together with Parkyn's figures, disclose that light is diverged away from the central axis and that the strength of divergence decreases as the angle from the axis increases, which are the two Conditions claimed in the '723 patent. As the Board noted, there is no requirement for anticipation that the prior art use the same terms to describe the invention.

Enplas's arguments on appeal, as before the Board, avoid focusing on the evidence that formed the basis for the Board's decision, attempting instead to divert the Court's attention to issues that are irrelevant to the central question – whether the Board's findings are supported by substantial evidence. Enplas's suggestion, for example, that Petitioners were required to "repeat [the] comparison [between θ1 and θ5] for every possible light ray within the half-intensity-angular-range" (Appellant Br. at 29), mischaracterizes the relevant standard of proof. And Enplas's renewed attack on Dr. Sasian's drawings and computer simulations is equally inapposite on appeal as it was before the Board, because the Board expressly disclaimed reliance on that evidence.

In addition, contrary to Enplas's suggestion, the Board made no claim constructions that might be subject to *de novo* review, because Enplas did not argue that any claim terms needed to be construed. What Enplas characterizes as claim construction amounts to no more than a short-hand reference to the relationships disclosed by the claimed ratios.

18

The Board's factual findings of anticipation are well supported by evidence in the record, and this Court should affirm.

## ARGUMENT

### I.    Standard of Review

The Board's finding of anticipation is an issue of fact.[5] *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997). The Board's findings of fact are reviewed for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). "Substantial evidence is more than a mere scintilla . . . [or] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The Board did not engage in claim construction, because Enplas argued that none was necessary. Enplas's claim construction argument on appeal is therefore waived. To the extent the Board's restatement of the claim's ordinary meaning did qualify as claim construction, factual determinations underlying that construction would be reviewed based on the standard of review for issues of fact, but the

---

[5]    As discussed in the Procedural History section of the Statement of the Case, having concluded that the claims were invalid as anticipated, the Board did not reach single-reference obviousness based on Parkyn in the Final Decision. In addition, Patent Owner does not separately appeal the Board's obviousness decision as to claims 9-16 based on Parkyn in view of Amano. Based on the current record, therefore, only the standard of review for anticipation is applicable.

ultimate claim constructions would be reviewed *de novo*. *Teva Pharm. USA, Inc. v.*

*Sandoz, Inc.,* 135 S. Ct. 831, 841 (U.S. 2015).

## II.    The Board's Anticipation Finding Is Supported by Substantial Evidence

### A.    Substantial Evidence Supports the Board's Finding that Parkyn Discloses Conditions 1 and 2

The record evidence supporting the Board's decision as to Conditions 1 and

2, which are the sole focus of Enplas's appeal (*see*, *e.g.*, Appellant Br. at 20-23), is

far more than the "more than a mere scintilla" required.[6] In the portion of the Final

Decision directed to Conditions 1 and 2, the Board expressly relied on figures and

passages from Parkyn, as well as the expert testimony of Dr. Sasian, to support its

anticipation holding. (A10-11.)

The Board cited to Parkyn's disclosure of "a textual description of the

curvatures of mushroom lens 39 (Fig. 7), depicted as mushroom lens 113 in

Parkyn's Figure 15a." (A10 (citing Parkyn Fig. 7, Fig. 15a, 5:46-51, 6:59-62).) The

Board also relied on the unrebutted findings from its Institution Decision. (A10,

A11.) Those findings expressly relied on additional figures and passages from

Parkyn. (A163 (citing Parkyn Fig. 2a, Fig. 11, Fig. 14a, 2:5, 2:36-38).) In addition,

the Board relied on the evidence cited and analysis provided in paragraphs 53

---

[6]    Enplas does not dispute that the Board's findings as to the remaining elements of claim 1 and the other claims are supported by substantial evidence. *See*, *e.g.*, *id.*; *see also id.* at 46-49.

through 66 of Dr. Sasian's declaration. (A10-11 (citing Sasian Decl. ¶¶ 53-66

(A747-53)).) The Board also assessed the credibility of both Dr. Sasian and

Enplas's declarant Dr. Drabik.[7] Based on its review of the credentials, declarations,

and deposition transcripts of the declarants, the Board "credit[ed] Dr. Sasian's

testimony over that of Dr. Drabik with respect to what the text and drawings of

Parkyn actually convey to one of ordinary skill in the art." (A11; *see also id.* at

A11-12 (criticizing Dr. Drabik for addressing an issue "outside the scope of the

claim[s]" that was "of little import").)

The Board credited the explanation provided by Dr. Sasian of the optical

properties described by Conditions 1 and 2. (A9.) In particular, the Board agreed

that "Condition 1[ ] merely means that the outer surface of the lens causes light

rays emitted from the light source to be deviated away from the central axis of the

lens" and that "Condition 2[ ] is directly related to the amount of deviation, where

the amount of deviation . . . will be greatest near the central axis of the lens and

will decrease at increasing angles from the optical axis." (*Id.*) Significantly,

Enplas's expert, Dr. Drabik, expressly adopted Dr. Sasian's explanation of

---

[7]    Although *inter partes* review proceedings do not include live witness
testimony, which would render credibility findings effectively unreviewable,
*Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010), the Board's credibility
assessments are reviewed under the same deferential standard as the Board's other
factual findings. *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1336
(Fed. Cir. 2015).

Condition 2. (A227.) Dr. Drabik testified that "[Dr.] Sasian correctly notes [that Condition 2] requires the degree of deviation of light induced by the lens through which it is directed to decrease over distance from the central axis." (*Id.*; A10 (quoting same).) And Enplas did not dispute Dr. Sasian's explanation of Condition 1, even after the Board used that explanation in the Institution Decision. (*See id.*) Dr. Sasian simply put into prose the relationships reflected by the formulas: that θ5 is larger than θ1, which is the result of the light ray being deviated away from the central axis; and the ratio of θ5 over θ1 decreasing, which is the result of the strength of deviation decreasing away from the optical axis.

The Board also relied on several paragraphs of Dr. Sasian's declaration in which he described in detail what a person of ordinary skill in the art would understand based on the written description and figures in Parkyn. In particular, the Board relied on Dr. Sasian's citation to "specific text in Parkyn," including Parkyn's "textual description of the curvatures of mushroom lens 39 (Fig. 7), depicted as mushroom lens 113 in Parkyn's Figure 15a." (A10 (citing Sasian Decl. ¶ 54 (A747)).) Dr. Sasian emphasized Parkyn's description of the mushroom lens 39 of figure 7 (reproduced to the right) as having "[a] hemispherically concave inner surface 39a, of greater



22

curvature (i.e., smaller radius) than the varying curvatures of convex outer surface 39b, such curvatures decreasing at regions toward axis 24, becoming concave (demagnifying) at central outer surface 39c." (A747 ¶ 54 (citing Parkyn at 5:46-51 (A501)).)

Using the corresponding shape shown for mushroom lens 39 of figure 11 (reproduced in relevant part to the right), Dr. Sasian explained how different portions of the upper surface deviate light. (A749 ¶¶ 57-58.) In particular, he explained that the central concave dip is "[a] negative lens that, by its nature, is divergent . . . [*i.e.*] rays from the source 15 start as diverging rays which are even more divergent after being refracted by the concave central dip." (*Id.* ¶ 57.) Regarding the strength of divergence of the central dip, Dr. Sasian explained that due to its concave shape, the dip is "strongly divergent." (A750 ¶ 61.)

As to the portion of the upper lens surface surrounding the central dip, Dr. Sasian explained "the light emitting source is so close to the light control face that rays are not made to converge, but instead continue to diverge to a lesser degree after refraction at the light control surface." (A749 ¶ 58.) He further explained that the strongly divergent central dip "transitions smoothly to a convex shape," which results in a lessening of the deviation. (A750 ¶ 61.)

23

The foregoing descriptions correspond directly to the divergence properties of Conditions 1 and 2 – that light is diverged and that the strength of divergence decreases. These conclusions regarding what Parkyn disclosed were further supported by Parkyn's description of the mushroom lens as a "light ray deviator" and to Parkyn's disclosure that "the deviator lens makes the rays appear to come from a virtual source that is above the real source." (A749 ¶ 59.) Dr. Sasian explained that "[t]his is a statement that the lens increases divergence of the emitted light rays that reach the top surface, and is equivalent to the condition $(\theta 5/\theta 1>1)$." (*Id.*)

The Board also cited Dr. Sasian's analysis of figure 3 of Parkyn (reproduced to the right), which depicts the alternative thin lens embodiment of the deviator lens. (A752-53 ¶ 65.) As Dr. Sasian explained, both the thin and thick (mushroom) embodiments perform the same optical function. (*Id.*) Indeed, the fact that both



embodiments perform the same function was conceded by Enplas's declarant. (A1127 n.2.) Because the lenses perform the same function, Dr. Sasian was able to conclude, based on the example light rays disclosed in figure 3, that Conditions 1 and 2 are met. (A752-53 ¶¶ 65-66.)

24

In addition to explaining how the disclosed shape of mushroom lens 39 bends light, Dr. Sasian also relied on Parkyn's description of light intensity distributions with and without the mushroom lens as further disclosing Conditions 1 and 2. (A751-52 ¶¶ 62-63.) In particular, he provided a modified version of Parkyn figure 2a (reproduced to the right), which depicts the prior art light distribution that Parkyn sought to improve. (*Id.*) The added red line indicates the approximate location of the half-intensity-angular-range. (*Id.*) Dr. Sasian then contrasted the prior art distribution of figure 2a with figure 14a (reproduced to the right), which depicts the distribution achieved by adding the mushroom lens:





> The central peak region [in figure 2a], which approximates the location of the ***half-intensity angular region*** is shown [in figure 14a] as spread and smoothed out over a larger region.

(A752 ¶ 63 (emphasis added).) "Based on the shape of Parkyn's light flux control member and the effect that the light flux control member has had on the light passing through it," Dr. Sasian explained, "it can be concluded that divergence ($\theta 5/\theta 1>1$) has occurred over a broad angular range (showing that Condition 1 is

met) and that the ray deviation (θ5/θ1) has decreased gradually with increasing θ1 (showing that Condition 2 is met)." (*Id.*) The Board expressly relied upon these paragraphs as explaining how "the claimed 'Condition 1' and 'Condition 2' . . . are met by structures described by Parkyn," including the half-intensity-angular-range requirement. (A9 (citing Sasian Decl. ¶¶ 53-66 (A747-53).)

## B.    Enplas Intentionally Left the Evidence Supporting Anticipation Unrebutted

As discussed in the preceding section, the evidence supporting anticipation is significant. In addition, as discussed in Seoul Semiconductor's Statement of the Case, the Board correctly found that Enplas failed to respond to much of that evidence, leaving it unrebutted. (A163-64 ("Patent Owner does not . . . address Dr. Sasian's analysis based on the breadth of the claim terms, specific text in Parkyn, . . . the general shape of the structures in Parkyn's drawings that are consistent with the reference's verbal description of the structures . . . [or] Dr. Sasian's additional, supporting analysis of Figures 2a and 14a"), A11 ("Patent Owner does not address directly the text and drawings in Parkyn upon which Dr. Sasian bases his opinion, nor submits how the claimed Conditions might distinguish over Parkyn's relied upon description.").)

The fact that the evidence relied on by the Board was unrebutted, and indeed, remains unrebutted here, is relevant to the substantial evidence inquiry. *O'Brien v. Office of Personnel Management*, 144 F.3d 1458, 1462 (Fed. Cir.

1998). Despite the fact that Dr. Sasian's testimony here lacks the significant

infirmities described in *O'Brien*, the Court's analysis in that case is instructive:

> We hold that Ms. Oland's testimony and declaration satisfy the substantial evidence standard, although we regard the issue as a close one. By choosing to offer only the sparest account of why FQI was made a separate competitive area, the government flirted with the line between the presentation of probative evidence and the use of a witness simply to state a legal conclusion. Had Mr. O'Brien sought to challenge Ms. Oland's testimony, either by questioning her basis for knowledge or offering some reason to doubt the correctness of her assertion that the offices that were designated as separate competitive areas had "full delegated personnel management authorities," we might have found her testimony not to constitute substantial evidence that FQI was a properly constituted competitive area. ***But Ms. Oland's testimony on that issue was unchallenged and unrebutted, and in light of the absence of contrary evidence, we find it sufficient to sustain the administrative judge's ruling.***

*Id.* at 1462 (emphasis added).[8] Simply put, even equivocal evidence will be

deemed substantial when unchallenged and unrebutted. Here, Dr. Sasian's

testimony is unequivocal, as is the Board's reliance on that testimony.

---

[8] The Court has often remarked on evidence being "unrebutted" when confirming the existence of substantial evidence in the appellate record. *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1362 (Fed. Cir. 2000) (affirming an administrative judge's finding, in part, based on testimony that "was unrebutted by any evidence or cross-examination"); *see also Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013) ("Substantial evidence supports the jury's finding of commercial success . . . . But more important, the record contains unrebutted testimony establishing a nexus between the claimed technological advance of claim 8 and the success of the products."); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1350 (Fed. Cir. 2009) (affirming under the substantial evidence standard, in part, because the evidence in "the record stands unrebutted").

### III.   Enplas's Attempt to Manufacture a Claim Construction Dispute Fails

The primary argument raised by Enplas on appeal is that the Board incorrectly construed Conditions 1 and 2 prior to assessing anticipation. *See*, *e.g.*, Appellant Br. at 27.[9] A review of the Board's Final Decision makes clear that no such claim constructions exist, precisely because Enplas never requested them. (A6 ("We agree with the parties that the claimed 'conditions' do not require express construction."), A161 (same).) Enplas never asked the Board to adopt a construction, insisting instead that the Board apply the "plain language." (A132.) Having obtained precisely that result, Enplas waived the right to request a different construction on appeal. *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 681 (Fed. Cir. 2015) (finding waiver where a party contended that a term "needed no construction"); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) (waiver found "where a party 'never requested that the district court construe any terms in [the relevant claim] and never offered a construction of [that claim]'").

In a transparent attempt to obtain a less deferential standard of review, Enplas incorrectly asserts that the Board, contrary to its assertions, engaged in surreptitious claim construction, and that this Court should review that claim

---

[9]   Although it purports to raise a claim construction dispute, Enplas presents neither a proposed construction nor an analysis in support of that construction.

constructions *de novo*. Appellant Br. at 24-25. Enplas rests this argument on a single sentence from the Board's decision, which Enplas takes out of context. *Id.* (quoting A11). In its decision, the Board correctly noted that "the Conditions are not equations but appear to be, simply, broadly recited relationships (expressed as ratios) between two light emission angles, consistent with Dr. Sasian's verbal description of the Conditions." (A11.) By no reasonable interpretation did the quoted passage constitute a construction by the Board of Conditions 1 and 2. Rather, the cited passage reflects the Board's recognition that Conditions 1 and 2 are "expressed as ratios" that reflect the relationships between two angles, which relationship Dr. Sasian explained in words. (*Id.*) Although Enplas characterizes Conditions 1 and 2 as "precise mathematic requirements" (Appellant Br. at 31), they are far from precise. Condition 1 simply requires the ratio be somewhere *between 1 and infinity*. (A38 at 12:15.) And Condition 2 simply requires the ratio *to decrease*. *Id.* at 12:18. The Board's characterization, therefore, was not wrong, even if it were appealable. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983) ("We sit to review judgments, not opinions.").

Nor, contrary to Enplas's assertion, would the Board's application of the claim terms to the Sasian declaration be entitled to *de novo* review, even if claim construction were relevant to this appeal. Enplas relies on *Prolitec, Inc. v. ScentAir Technologies, Inc.*, 807 F.3d 1353, 1358 (Fed. Cir. 2015), to assert that the review

29

of the Sasian Declaration must be *de novo* (Appellant Br. at 24 n.3), but that is wrong. Although the Federal Circuit "review[s] the Board's ***ultimate*** claim construction de novo," it reviews the "underlying ***factual determinations*** involving extrinsic evidence ***for substantial evidence***." *Prolitec*, 807 F.3d at 1358 (emphasis added). Indeed, the Court in *Prolitec* affirmed the Board's claim construction, in part, by concluding that the Board's "subsidiary factual determination . . . was supported by substantial evidence." *Id.* at 1359.

Enplas's reliance on *SightSound Technologies, LLC v. Apple, Inc.*, __ F.3d __, 2015 WL 8770164 *6 (Fed. Cir. 2015), is equally mistaken. Enplas quotes that case as stating "[c]laim construction is a matter of law, and the Board's construction ***and application*** is a matter of law, and is reviewed de novo." Appellant Br. at 25 (emphasis added). Neither that quotation, nor the purported proposition of law appears in *SightSound*. More importantly, the purported quotation is directly contrary to this Court's precedent:

> Whether a patent is invalid as anticipated is also a two-step inquiry. Like infringement, the first step requires construing the claim, which is a question of law. . . . ***The second step in the analysis requires a comparison of the properly construed claim to the prior art and is a factual matter***.

*Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004) (emphasis added). Application of the prior art to the as-construed claim is a quintessential issue of fact, which is reviewed for substantial evidence. *Gartside,*

203 F.3d at 1312. The Court should not countenance this conduct. *Abbs v. Principi*,

237 F.3d 1342, 1345 (Fed. Cir. 2001).

## IV.    Enplas's Remaining Arguments Fail to Establish a Lack of Substantial Evidence

### A.    The Board's Finding that Parkyn Disclosed Conditions 1 and 2 Over the Half-Intensity-Angular-Range Is Supported By Substantial Evidence

Although provided in the section of its brief addressed to claim construction,

Enplas presents for the first time on appeal its theory regarding the minimum facts

necessary to establish anticipation:

> To prove these Conditions are satisfied, it is necessary to compare the angle of emission of a light ray being emitted by the light emitting element within the half-intensity-angular-range (i.e., $\theta 1$) to the angle of emission from the surface of the lens for the same light ray (i.e., $\theta 5$) and then repeat that comparison for every possible light ray within the half-intensity-angular-range.

Appellant Br. 29. Enplas implies that Seoul Semiconductor conceded this

requirement by "observ[ing] the requirement that the angles be measured and

compared." *Id*. at 30. The procedural and factual flaws in Enplas's argument are

many.

First, Enplas never previously raised this argument. Therefore, Enplas's

implicit argument – that the Board erred by accepting different facts as sufficient –

was waived. *Redline Detection, LLC v. Star Envirotech, Inc*., 811 F.3d 435, 450

(Fed. Cir. 2015) ("Because this court's review of the PTAB's decision 'is confined

to the 'four corners' of that record[,] . . . it is important that the [appellant]

31

challenging a decision not be permitted to raise arguments on appeal that were not presented to the [Board].'") (quoting *In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004)).

Second, the Petition identified in detail how each of the recited limitations, including the half-intensity-angular-range, is disclosed in Parkyn. (*See, e.g.*, A61-62, A64-68.) The record evidence cited by the Board explicitly states the basis for finding that Parkyn disclosed Conditions 1 and 2 over the half-intensity-angular-range. In testimony expressly cited by the Board, Dr. Sasian explained that, "[b]ased on the shape of Parkyn's light flux control member and the effect that the light flux control member has had on the light passing through it, it can be concluded that divergence ($\theta 5/\theta 1>1$) has occurred over a broad angular range (showing that Condition 1 is met) and that the ray deviation ($\theta 5/\theta 1$) has decreased gradually with increasing $\theta 1$ (showing that Condition 2 is met)." (A752 ¶ 63; A9 (citing same).) The Board also cited Dr. Sasian's comparison of the light intensity plots provided in figures 2a and 14a, which he related directly to the half-intensity-angular-range requirement. (A9, A11 (citing Sasian Decl. ¶¶ 63-64 (A751-52)).)

The existence of Conditions 1 and 2 over the claimed range is further supported by additional record evidence not expressly referenced by the Board. But there is no requirement in a substantial evidence review that the Board have expressly cited that evidence. *Gartside*, 203 F.3d at 1312 ("'substantial evidence'

review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision"). Dr. Sasian's explanation of the characteristic center-bright light intensity distribution of LEDs provides further support for the Board's finding. (A739-40 ¶¶ 40-42.) In particular, he related that characteristic distribution to both (1) the claimed half-intensity-angular-range and (2) the lens shapes disclosed in Parkyn. (A762-63 ¶¶ 84-85.) That analysis further supported the Board's conclusion that the half-intensity-angular-range aspect of Condition 1 and Condition 2 is disclosed in Parkyn. (*Id.*)

Third, Enplas misapprehends the proper scope of appellate review. The question is not what evidence Enplas, or even this Court, would have accepted to establish anticipation in the first instance. *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) ("even assuming we might find differently if we had to make these findings in the first instance, we obviously have no authority to do so now"). Rather, the issue is whether the evidence in the record provides the requisite substantial evidence for the findings the Board made. *Gartside*, 203 F.3d at 1315.

## B.    Enplas's Arguments Regarding the Reliability of Parkyn's Figures and Dr. Sasian's Drawings Are Misdirected

Enplas asserts that the Board erred by relying on hand drawings and simulations as the basis for its holding of anticipation (Appellant Br. at 21, 37), but

33

that argument mischaracterizes the Board's decision, which expressly disclaimed such reliance.

Enplas's assertion that "the Board relied on Sasian's incomplete simulations based on physical measurements of the not to scale dimensionless figures in Parkyn" (*id.* at 21), lacks any citation to the record because is in direct conflict with the Final Decision. In the Final Decision, the Board made clear that it had "instituted trial on the basis of ***the text and drawings*** that provide that description." (A11 (emphasis added).) Citing its Institution Decision, the Board explained that it had found "that the Sasian Decl. ¶¶ 53–66 is sufficient to show, to a reasonable likelihood, that Parkyn anticipates claim 1–and, ***thus, [there was] no need to address Patent Owner's arguments regarding hand drawings and computer simulations submitted as confirmation of anticipation***." (*Id.* (emphasis added).)

The relied-on paragraphs 53-66 were those in which Dr. Sasian explained how his opinion was based on the written disclosures and figures of Parkyn itself. The hand drawings and simulations are, thus, immaterial, because they were not the basis of the Board's finding of anticipation. As the Board explained, "[e]ven if Patent Owner were to demonstrate error in the drawings and computer simulations that might be based on drawing dimensions in Parkyn, that would not demonstrate error in Petitioner's position with respect to what Parkyn's description conveys to one of ordinary skill in the art." (A12.) The Board correctly observed that Seoul

Semiconductor had relied on "Dr. Sasian's testimony based on hand drawings and computer simulations," which were in a separate part of the Declaration (Sasian Decl. ¶¶ 87–92 (A764-66), "only as **confirmation** that the claims are anticipated by Parkyn." (A12 (emphasis added).) Enplas's attack on those drawings is therefore entirely irrelevant to the issue presented on appeal.

Enplas's assertion of error on the ground that one of the paragraphs cited by the Board included a figure created by Dr. Sasian (Appellant Br. at 39), fairs no better. That figure (A750 ¶ 61) was unambiguously presented as an "illustrat[ion]" of Dr. Sasian's analysis of the text and figures of Parkyn. (*Id*.) The Board relied on that **analysis** of the "text" and "shape" of Parkyn's figure. (*See* A10 ("With respect to Condition 2, in addition to referring to the text of Parkyn (Sasian Decl. ¶ 54), Dr. Sasian refers also to the shape of Parkyn's light flux control member and explains how the claimed 'Condition 2' relationship between θ5 and θ1 is met by the reference (*id.* ¶ 61).").) In contrast, the Board did not rely on Dr. Sasian's "ray tracings," which were presented *as direct evidence* of anticipation. (A765 ¶ 89; A12.) Enplas's claim of error, therefore, is wrong.

For the same reason, Enplas's argument that prior art figures may not be relied on quantitatively (Appellant Br. at 38-41), is misplaced. Because the Board did not rely on Dr. Sasian's hand drawings and simulations quantitatively or even qualitatively, those principles have no relevance to the issues currently on appeal.

35

Rather, discussing *In re Mraz*, 455 F.2d 1069 (CCPA 1972), the Board's explained that while "[p]atent drawings not designated as being drawn to scale cannot define the precise proportions of the elements and cannot be relied upon to show particular sizes if the specification is completely silent on the issue," such drawings could be "evaluated on the basis of what it reasonably discloses and suggests to a person of ordinary skill in the art." (A7.) Indeed, as the Board observed, "[i]t has long been the case that '[d]escription for the purposes of anticipation can be by drawings alone as well as by words.'" (*Id.* (quoting *In re Bager*, 47 F.2d 951, 953 (CCPA 1931)).) The Board properly relied on the shapes disclosed in the figures and what those shapes and corresponding textual passages from the specification together disclose to a person of ordinary skill in the art. (*See* A163 ("Patent Owner does not, however, address Dr. Sasian's analysis based on . . . the general shape of the structures in Parkyn's drawings that are consistent with the reference's verbal description of the structures.").) That reliance was entirely proper. *Schreiber*, 128 F.3d at 1478 (relying on the "general shape" depicted in a patent's figures).

## C.    Enplas's "*ipssimis verbis*" Test for Anticipation is Baseless

Enplas's argument, in the face of the extensive record evidence supporting the Board's conclusions, boils down to the incorrect suggestion that the prior art must use the same language as the claims. Enplas stresses, for example, that "nowhere does Parkyn disclose in any way the specific mathematical equations

contained in the claims." Appellant Br. at 35. But no such requirement exists. As the Board correctly explained, "anticipation is not an 'ipssimis verbis' test." (A11.) (citing *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990)). "It is not necessary that the [prior art] describe the invention in the same terms as the application, but only that it discloses the ***same inventive concept***." *In re Pappas*, 214 F.2d 172, 177 (C.C.P.A. 1954) (emphasis added).

Whether stated using mathematical symbols, as was done in the '723 patent, or using words (*see* A9), Conditions 1 and 2 are more than adequately disclosed by Parkyn. To solve the same center-heavy light distribution that steadily falls off to the edges as identified by the '723 patent, Parkyn explains that the "light ray deviator [is] positioned along the path of light travel between the source and the TIR lens, for deviating light rays toward portions of the lens spaced from the axis, thereby to more evenly distribute light flux at the TIR lens." (A499 at 1:48-52.) That Parkyn expressed this concept as "deviating light rays" rather than as formulas is irrelevant. *Pappas*, 214 F.2d at 177.

### D. Enplas's Attempts to Narrow Parkyn's Disclosure and Add Further Limitations to the '723 Patent Lack Merit

#### 1. *The Board correctly rejected Enplas's argument that Parkyn requires a Total Internal Reflection (TIR) lens together with a mushroom lens*

Enplas presents two similar arguments directed to Parkyn's disclosure of a total internal reflection (TIR) lens in combination with the mushroom lens cited by

Seoul Semiconductor. First, Enplas urges that Parkyn is limited to "a two lens system." Appellant Br. at 11, *see also id.* at 13 ("the entire purpose, each embodiment, and every claim of the Parkyn reference extols the benefits and is directed to the use of a TIR lens system"). And second, Enplas asserts that the shape of Parkyn's mushroom lens can be determined only in view of a specific TIR lens. *Id.* at 17, 39. The Board correctly dismissed both. (A12, A166.)

As to the "two lens" argument, the Board explained in its Institution Decision that "[t]here is insufficient evidence, on this record, that the claims might somehow preclude a TIR lens from being in combination with the elements set forth by the open-ended (i.e., "comprising" format) claims." (A166.) Enplas neither cites to nor substantively disputes this conclusion. Nor can it. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("The transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements.").

As to the argument that a TIR profile must be selected before the shape of the mushroom lens, this too misconstrues the nature of the relevant claims. Claim 1 is an apparatus claim. As the Board explained, "[t]hat one might be able to follow the teachings of Parkyn and construct a mushroom lens that is outside the scope of the claimed Conditions is of little import when the claims set forth an apparatus, as

opposed to setting forth methods of making the apparatus." (A11-12.) The proper focus is on the nature of the mushroom lenses actually disclosed in Parkyn. Enplas simply ignores the fact that lenses are described in the specification and depicted in the figures.

    2.    *Because the claims do not require "uniform" light, Enplas's arguments about Parkyn's non-uniformity are irrelevant*

The terms "uniform" and "non-uniform" are used throughout Appellant's Brief. Appellant Br., *passim*. For example, according to Enplas "[Dr.] Sasian also acknowledged [in a statement filed with the Japanese Patent Office] that in fact the result of practicing Parkyn by providing only the 'mushroom lens' for the flux control emission lens resulted in illumination that is dramatically non-uniform." *Id.* at 42. Even if Enplas's characterization of Dr. Sasian's statement were accurate (it is not), it would still be irrelevant to this appeal. The language of claim 1 does not require uniformity (A38 at 12:4-24), nor does Enplas seek a construction requiring uniformity. Indeed, had Enplas sought such a construction, the '723 patent's specification would not have provided support. (*See*, *e.g.*, A29, A37 at 10:53-55 (describing the preferred embodiment's intensity curve as "a gently rising mountain").)

Instead, Enplas implies without support that a "uniform emission density [is] achieved by observing Conditions 1 and 2 of the Claims of the '723 Patent." Appellant Br. at 42. The implication that uniform illumination necessarily follows

for every lens that possesses a θ5/θ1 ratio of between 1 and infinity and that decreases has not remotely been established by Enplas. To the contrary, as discussed in the preceding paragraph, even the preferred embodiment of the '723 patent does not. Instead, at best that embodiment provides improved uniformity (A36 at 7:33-35 ("[the] emission from light control emission face 5 in accordance with the present invention occurs more uniformly")), a characteristic also provided by Parkyn's mushroom lens (A499 at 1:48-52).

### E.     Enplas's Attacks on the Form and Alleged Motivation Behind the Board's Decision are Baseless

The final substantive argument presented by Enplas is that the Board failed to present the requisite "findings of fact" on anticipation. Appellant Br. at 43. Enplas, however, fails to state precisely what it means by "findings of fact" or what it considers to be missing from the Board's decision. *Id.* The Board reviewed the evidence, resolved the disputed issues of fact, and concluded that the claims are anticipated. (A9-15.) To the extent that Enplas asserts that a specific formalistic requirement was not met in the decision, it cites no basis. Instead, it presents citations to and incorrectly paraphrases irrelevant cases.

For example, according to Enplas, *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 21 (Fed. Cir. 2012), required the Board to make "findings of fact." Appellate Br. at 43. That case, however, reviewed a jury verdict. *Whitserve*, 694 F.3d at 21. No specific format for Board decisions was discussed or implied.

40

Next, Enplas paraphrases *In re Jung*, 637 F.3d 1356, 1362 (Fed. Cir. 2011), for the proposition that "it is not the responsibility of the Patent Owner initially to point out where anticipation fails." Appellant Br. at 43. That citation, which points to the appellate review of an examiner's obviousness rejection during *ex parte* prosecution, says nothing of the sort. *Jung* 637 F.3d at 1362. Moreover, even if the case stated the proposition for which it is cited, Enplas explains neither (1) how such a decision from the context of *ex parte* prosecution would apply to this *inter partes* proceeding, nor (2) how the Board's Final Decision fails to meet that purported requirement.

Enplas's citation to *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 768 (Fed. Cir. 2014), is equally flawed. Appellant Br. at 44. The pin citation provided is directed to the "Background" section of the opinion, which merely provides a description of the district court's disposition of a summary judgment motion. *Aqua Shield*, 774 F.3d at 768. Again, there is no discussion by the Federal Circuit of the required format for a final decision from the Board.

Reviewing all of Enplas's citations generously, they stand at most for the undisputed legal requirement that an anticipatory reference disclose all elements of a claim either expressly or inherently. Because the Board's findings were directed to precisely that issue, Enplas fails to remotely suggest the Board's decision was procedurally flawed.

41

In addition, instead of limiting its arguments to the findings and conclusions of the Board, Enplas instead appears to question Board's the motivations and impartiality:

> The Board, however, without argument from either party, decided to abandon the precise claim construction the parties had agreed and relied upon and recharacterized the precise mathematical requirements as nothing more than "broadly recited relationships." . . . ***Presumably this was done in order to avoid the need to inspect Parkyn to determine if . . . Conditions 1 and 2 were met everywhere within the half-intensity-angular-range***.

Appellant Br. at 30-31 (emphasis added).

> ***With respect, PO submits the Board misconstrued the claims in a deliberate fashion*** that allowed it to rely on a superficial resemblance between the shape of the lens that is required by the '723 Patent claims and the mushroom lens of Parkyn which is determined not by precise mathematic expressions, but by the profile of a TIR lens that is nowhere disclosed in Parkyn.

*Id*. at 48 (emphasis added). This Court should not countenance these *ad hominem* attacks.

## V.    Should the Court Determine that the Board's Decision was not Supported by Substantial Evidence, Seoul Semiconductor Requests Remand for Consideration of Issues Passed On by the Board

As discussed in the Procedural History section of the Statement of the Case, the Board did not reach the issue of single-reference obviousness based on Parkyn in its Final Decision. The Board also did not consider whether Parkyn's figures were reliable for purposes of the analyses performed by Dr. Sasian. Should the Court determine that the evidence of record is insufficient to meet the substantial

evidence standard, then Seoul Semiconductor respectfully requests remand for consideration of the issues passed on by the Board. *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1349 (Fed. Cir. 2013); *In re Chapman*, 595 F.3d 1330, 1340 (Fed. Cir. 2010).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court affirm the decision of the Patent Trial and Appeal Board finding that claims 1-9 and 11-17 of the '723 Patent are invalid.

Respectfully submitted,

/s/ *Michael B. Eisenberg*
Michael B. Eisenberg
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3200
*Attorneys for Appellees*

# United States Court of Appeals
## for the Federal Circuit

### CERTIFICATE OF SERVICE

Enplas Corporation v. Seoul Semiconductor Co., Ltd., North America Seoul
Semiconductor, Inc.,  2016-1282

I, Robyn Cocho, being duly sworn according to law and being over the age
of 18, upon my oath depose and say that:

Counsel Press was retained by HOLLAND & KNIGHT, Attorneys for Appellees
to print this document.  I am an employee of Counsel Press.

On **March 16, 2016**, Counsel for Appellees has authorized me to
electronically file the foregoing **Brief for Appellees** with the Clerk of Court using
the CM/ECF System, which will send notice of such filing to the following
registered CM/ECF users:

Marc R. Labgold
Patrick J. Hoeffner
Law Offices of Marc R. Labgold, P.C.
12005 Sunrise Valley Drive
Suite 203
Reston, VA  20191
703.901.8860
Counsel for Appellant

Steven B. Kelber
The Kelber Law Group
1875 Eye Street, NW
Fifth Floor
Washington, DC  20006
240.506.6702
Counsel for Appellant

Upon acceptance by the Court of the e-filed document, six paper copies will
be filed with the Court, via Federal Express, within the time provided in the
Court's rules.

/s/ Robyn Cocho
Counsel Press

# CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and (C) that the foregoing BRIEF OF APPELLEES contains 10, 032 words, as measured by the word-processing system used in its preparation.


/s/ *Michael B. Eisenberg*
Michael B. Eisenberg


Dated: March 16, 2016